**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| VARA-PORTOFINO TECH CENTER | § | |
| L.L.C. and WALLACE-PORTOFINO TECH | § | |
| CENTER L.L.C., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2376 |
| | § | |
| SANDVIK MINING AND | § | |
| CONSTRUCTION USA, L.L.C. | § | |
| and SANDVIK, INC., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

The plaintiffs, Vara-Portofino Tech Center L.L.C. and Wallace-Portofino Tech Center L.L.C.,  sued Sandvik Mining and Construction USA, L.L.C. and Sandvik, Inc. (together, "Sandvik"), alleging breach of a lease contract and seeking damages and declaratory relief. (Docket Entry No. 1).  Sandvik moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). (Docket Entry No. 5).  The plaintiffs responded, (Docket Entry No. 8), Sandvik replied, (Docket Entry No. 10), and the plaintiffs filed a surreply.  (Docket Entry No. 12). Sandvik argues that there is no subject-matter jurisdiction because the plaintiffs lack standing to sue. Sandvik argues that the plaintiffs were not parties to the lease in question and that the lease is no longer in effect.  (Docket Entry No. 5).  The plaintiffs maintain that they are parties to the lease and have standing to sue to enforce it.  (Docket Entry No. 8).

Based on a careful review of the complaint; the motion, response, reply, and surreply; the exhibits; and the applicable law, this court denies Sandvik's motion to dismiss. The reasons are explained below.

I.    **Background**

The allegations present the following chronology.

- On March 6, 2006 Sandvik entered into a commercial lease ("the Lease") with Today Portofino Tech, LP for space in the Portofino Technology Center in Shenandoah, Texas. The Lease term ended September 30, 2012. On the same day, Sandvik signed a separate agreement with Today Portofino guaranteeing Sandvik's payment and performance under the Lease. (Docket Entry No. 1).

- On October 27, 2007 Sandvik and Today Portofino signed an amendment to the Lease increasing the size of the leased premises and extending the term to December 31, 2015.

- On August 5, 2008, Today Portofino assigned its rights and interests in the Lease to Portofino Tech Center Acquisition LLP ("PTCA"). The same day, PTCA entered into a master lease agreement ("Master Lease") with DBSI Portofino Tech Center LeaseCo LLC ("DBSI"). The Master Lease was for a twenty-year term. (Docket Entry No. 5, Ex. D).

- Also on August 5, 2008, PTCA sold its interest in the property to the plaintiffs.[1] As

---

[1]   In their response, the plaintiffs note that the original complaint and Sandvik's motion to dismiss "mistakenly stated that the [p]laintiffs acquired PTCA's interest in the Leased Premises and the Lease in September 2008." (Docket Entry No. 8, n.4). The plaintiffs state that the deeds from PTCA were effective on July 30, 2008 but PTCA did not acquire title to the premises and Lease until August 5, 2008 when PTCA executed the special warranty deed: "[a]pplying the doctrine of after-acquired title, [p]laintiffs are deemed to have acquired title to the Leased Premises and the Lease effective August 5,

2

part of the sale, the plaintiffs acquired PTCA's interest and rights in the Master Lease between PTCA and DBSI.  (*Id*.).  The plaintiffs contend that PTCA also transferred its interest and rights in the Lease between Today Portofino and Sandvik, "creating a direct landlord-tenant relationship between Plaintiffs and [Sandvik]." (Docket Entry No. 1 at 4).  Sandvik maintains that "[a]lthough the Plaintiffs became DBSI's landlord, DBSI remained [Sandvik]'s sublandlord.  No direct contractual relationship existed between Plaintiffs and [Sandvik]."  (Docket Entry No. 5 at 3).

- In November 2008, DBSI declared bankruptcy. In February 2009, the United States Bankruptcy Court for the District of Delaware signed an Order approving DBSI's rejection of the Master Lease.  (Docket Entry No. 1 at 4, Docket Entry No. 5 at 4). The plaintiffs include in their complaint language from this Order stating that it was not to be ". . . construed as a determination, nor an acknowledgment or agreement on the part of any party that (a) the applicable Debtors' interests in any agreement referred to as a "sublease" [was], in fact, a sublease, (b) that such agreement constitute[d] property of the Debtors' estate, or (c) that rejection of the Masterleases, Subleases or Contracts [thereunder should] have any impact on any agreement between non-debtor parties. . . ."  (Docket Entry No. 1 at 4).

The plaintiffs allege that Sandvik has refused to pay rent under the Lease for April, May, June, and July 2009.  (Docket Entry No. 1 at 5).  The plaintiffs seek a declaratory judgment that the Order issued in DBSI's bankruptcy proceeding only affected the Master Lease and did not approve

---

2008, the date on which PTCA acquired title."  (*Id*.) (citing *Shield v. Donald*, 253 S.W.2d 710, 712 (Tex. App.—Fort Worth 1952, writ ref'd n.r.e.)).

3

the rejection of the Lease between the plaintiffs and Sandvik, because the Lease existed before the Order. (Docket Entry No. 1 at 6). The plaintiffs argue in the alternative that if the Bankruptcy Court's Order did approve rejection of the Lease, Sandvik still does not have the right to terminate the Lease. (*Id*. at 7). According to the plaintiffs, the rights under the Master Lease that DBSI rejected in the Bankruptcy Court's Order existed between DBSI and the plaintiffs, and the termination of those rights did not terminate "the rights and obligations of any non-debtor parties, as confirmed and stated in the Bankruptcy Order. . . ." (*Id*.). The plaintiffs state that if Sandvik is allowed to terminate its obligations under the Lease, the plaintiffs will lose rent through December 31, 2015, the end of the lease term, totaling at least $1.39 million. The plaintiffs seek a judgment declaring that their Lease with Sandvik is a direct lease and not a sublease; that the Lease was not rejected by the Bankruptcy Court's Order; and that the Bankruptcy Code does not give Sandvik the right to terminate the Lease. The plaintiffs seek damages "in excess of $87,414.77" for Sandvik's failure to pay rent, as well as damages under the guarantee agreement and attorneys' fees. (*Id*. at 9).

Sandvik argues in its motion to dismiss that the plaintiffs "cannot establish standing as a matter of law because (1) there is no direct lease between plaintiffs and [Sandvik] and (2) there is no privity of contract between a master lessor and a sublessee." (Docket Entry No. 5 at 6). Sandvik argues that "in order to have standing to assert breach of contract and declaratory judgment claims related to the Lease, Plaintiffs must be parties to the Lease." (*Id*.). According to Sandvik, there has never been a lease between the plaintiffs and Sandvik. Instead, Sandvik entered into the Lease with Today Portofino, which assigned the Lease to PTCA, which then assigned it to DBSI. (Docket Entry No. 5 at 7). DBSI notified Sandvik that it was the new landlord and would be collecting rent.

(*Id*.). Sandvik maintains that DBSI rejected the Lease in its bankruptcy proceeding and that at no time were the plaintiffs parties to the Lease. (*Id*.). Sandvik contends that the plaintiffs and DBSI were parties to the Master Lease, while Sandvik and DBSI were parties to the Lease. (Docket Entry No. 5 at 9). Therefore, Sandvik argues, there is no privity of contract between it and the plaintiffs. (*Id.*).

In their response, the plaintiffs argue that when PTCA conveyed the Lease to the plaintiffs effective on August 5, 2008, the accompanying special warranty deed demonstrated that PTCA "intended to convey whatever interests it had in the Premises to plaintiffs." (Docket Entry No. 8 at 5). The plaintiffs maintain that as a result, they have owned the premises and all accompanying rights and interests since August 5, 2008. (*Id*.). The plaintiffs also argue that in the Master Lease, DBSI "acknowledged that Plaintiffs held title to the Premises, and in the event DBSI was to file for bankruptcy protection . . . the Premises would revert back to Plaintiffs." (Docket Entry No. 8 at 3). Responding to Sandvik's argument that the Lease became a sublease under the Master Lease, the plaintiffs contend that they only conditionally assigned and transferred their rights and obligations under the Lease to DBSI and retained the right to reenter and repossess the premises. (Docket Entry No. 8 at 5). Because they retained a reversionary interest, the plaintiffs argue that the transfer under the Master Lease was not an assignment to DBSI and that there was no sublease between DBSI and Sandvik. (Docket Entry No. 8 at 6). The plaintiffs argue that they succeeded to Today Portofino's interest as a landlord under the Lease and have been in privity with Sandvik since PTCA's conveyance to the plaintiffs effective August 5, 2008. (Docket Entry No. 8).

In its reply in support of the motion to dismiss, Sandvik argues that the Master Lease "unequivocally assigned the Lease to DBSI." (Docket Entry No. 10 at 2). Sandvik argues that the

plaintiffs owned the property, DBSI became the lessor under the Lease, and the leased premises became a sublease. (*Id.*). When DBSI rejected the Master Lease in bankruptcy, its interest in the property was extinguished. (*Id.*). According to Sandvik, the Master Lease assigned the Lease to DBSI, gave DBSI the right to collect rent under the Lease, and defined the term "Sublease" to include the Lease. (Docket Entry No. 10 at 3-4) Because the Lease was assigned to DBSI, Sandvik maintains that the plaintiffs were not a party to the Lease and therefore lack standing to sue to enforce the Lease. (Docket Entry No. 10 at 4).

The plaintiffs filed a surreply to Sandvik's motion. (Docket Entry No. 12). The plaintiffs argue that under the Master Lease, DBSI's bankruptcy "triggered an event of default" and that their right to collect rent accrued on November 10, 2008, the date the bankruptcy was filed. (*Id.*). The plaintiffs again contend that Sandvik's argument that the Lease has been extinguished is contrary to the Lease and Master Lease provisions. (*Id.*).

## II.    The Applicable Legal Standards

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject-matter jurisdiction.  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)).  "A court may base its disposition of a motion to dismiss for lack of subject matter jurisdiction on (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Montez v. Dep't of the Navy*, 392 F.3d 147, 149 (5th Cir. 2002) (citing *Robinson v. TCI/US West Communications Inc.*, 117 F.3d 900, 904 (5th Cir. 1997)).  "No

6

presumptive truthfulness attaches to the plaintiff's allegations, and the court can decide disputed issues of material fact in order to determine whether or not it has jurisdiction to hear the case." (*Id.*). The plaintiff bears the burden of demonstrating that subject-matter jurisdiction exists. *Id.* In examining a factual challenge to subject-matter jurisdiction under Rule 12(b)(1), which does not implicate the merits of plaintiff's cause of action, the district court has substantial authority "to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997). The court may consider matters outside the pleadings, such as testimony and affidavits. *Id.*

### A.    Standing

Standing is a jurisdictional requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "[T]he irreducible constitutional minimum of standing is composed of three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Walker v. City of Mesquite*, 169 F.3d 973, 978–79 (5th Cir. 1999) (quoting *Lujan*, 504 U.S. at 560–61) (footnote, citations, and internal quotation marks omitted)). Failure to establish any one of these three standing requirements deprives a federal court of subject-matter jurisdiction to hear a lawsuit. *Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 332 (5th Cir. 2002).

### B.    Privity of Contract

Under Texas law, which the parties argue applies, a plaintiff must be a party to a contract

7

to have standing to sue for breach of that contract.  "In order to maintain an action to recover damages flowing from the breach of a written agreement, there must ordinarily be a privity existing between the party damaged and the party sought to be held liable for the repudiation of the agreement."  *Boy Scouts of America v. Responsive Terminal Systems, Inc.*, 790 S.W.2d 738, 747 (Tex. App.—Dallas 1990, writ denied).  Generally, a third party cannot sue to enforce a contract. "The general rule is that only the parties to a contract have the right to complain of a breach thereof; and if they are satisfied with the disposition that has been made of it and all claims under it, a third person has no right to insist that is has been broken."  *Rapid Settlements, Ltd. v. SSC Settlements, LLC*, 251 S.W.3d 129, 139 (Tex. App.—Tyler 2008, orig. proceeding).  A plaintiff asserting an affirmative claim for relief has the burden of showing that a valid contract exists between the plaintiff and the defendant.  *Basic Capital Mgmt v. Dynex*, 254 S.W.3d 508, 514 (Tex. App.—Dallas, 2008, pet. granted).

"Privity . . . means the mutual or successive relationship to the same rights of property." *Amstadt v. United States Brass Corp.*, 919 S.W.2d 644, 653 (Tex. 1996).  "Privity of contract is that connection or relationship which exists between two or more contracting parties.  It is essential to the maintenance of an action on any contract that there should subsist a privity between the plaintiff and defendant in respect to the matter sued on."  *McClellan v. Scardello Ford, Inc.*, 619 S.W.2d 593, 596 (Tex. App.—Amarillo, 1981, no writ).  Under Texas law, whether there is privity between parties to a lease when the lease has been conveyed depends on whether the conveyance was a sublease or an assignment.  As one court stated:

> [I]f an instrument conveys the entire 'term' of the lease without retaining any reversionary interest, the instrument will be construed as an assignment.  On the other hand, if the conveying party retains any reversionary interest in the estate conveyed, the instrument will

8

> be construed as a sublease.  In assigning the whole "term" of the
> lease, the word "term" means more than just the time for which the
> lease is given.  The assigning instrument must convey both the entire
> time for which the lease runs and the entire estate or interest
> conveyed by the original lease.  If the assignor-lessee retains a right
> to reenter and repossess the property on default of rental payments,
> the assignor-lessee retains a contingent reversionary interest and the
> instrument will be construed as a sublease.

*718 Assocs., Ltd. v. Sunwest N.O.P.*, 1 S.W.3d 355, 360-61 (Tex.App.—Waco 1999, pet denied).

No privity of contract exists under a sublease between the original lessor and the subtenant.

*Interstate Fire Ins. Co. v. First Tape, Inc.*, 817 S.W.2d 142, 145 (Tex.App.—Houston [1st Dist.]

1991, writ denied).  In an assignment, there is privity of contract between the lessor and lessee-

assignee.  *Id.*

     "A third-party stranger to a contract may enforce its terms only if the contracting parties

'intended to secure some benefit to that third party, and only if the contracting parties entered into

the contract directly for the third party's benefit.'"  *Id.* at 515 (citing *MCI Telecomms. Corp. v. Tex.*

*Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999)).  Courts presume that parties to a contract did

not intend  a third-party to benefit unless such an intent "clearly appears."  *MCI Telecomms. Corp.*,

995 S.W.2d at 651.  To qualify as a third-party beneficiary who may enforce the contract, the third

party must either be a donee or creditor beneficiary of the contract, and not someone who

incidentally benefits by contract performance.  *Basic Capital Mgmt.*, 254 S.W.3d at 515-16.  "A

donee beneficiary is one to whom the performance promised will, when rendered, come as a pure

donation. If the performance promised in the contract will inure to the benefit of a third party in

satisfaction of a legal duty owed to that third party, then the third party is a creditor beneficiary."

*Id.* at 516 n.8.

In *Graham v. Turcotte*, the court stated "[a] person cannot recover under a contractual theory in absence of showing privity of contract or *some special relationship*, such as a third party beneficiary contract." 628 S.W.2d 182, 183 (Tex.App.—Corpus Christi, 1982, no writ) (emphasis added). In *Graham*, the appellees contracted with a bank for a monthly payment real estate lien note. *Id*. The note contained a clause requiring the appellees to pay a percentage of the principal and interest owed as attorneys' fees if the note ever had to be given to an attorney for collection. *Id*. The appellees later defaulted on the note and had to pay a large amount of attorneys' fees. *Id*. The appellees sued the bank, its trustee, and the collections attorney, alleging that excessive attorneys' fees were charged. *Id*. at 182. The trial court granted an instructed verdict in favor of the bank and the trustee, and rendered judgment against the attorney, who then appealed. *Id*. The Court of Appeals reversed and held that there was neither privity between the borrowers and the attorney nor any other special relationship that would allow them to sue the attorney directly on the contract. *Id.* at 184.

While the *Graham* court referred to standing based on a "special relationship" with a party to the contract, Texas courts have accorded that status to third-party beneficiaries only. *See Broadnax v. Kroger Texas, L.P.*, No. 05-04-01306-CV, 2005 Tex. App. LEXIS 6865 (Tex.App.—Dallas August 24, 2005, no writ) ("A third party may recover on a contract made between other parties only if: (1) the other parties intended to secure some benefit for that third party; and (2) the contracting parties entered into the contract directly for the third party's benefit. To show the other parties intended to secure some benefit for the third party, the third party must demonstrate he is either a donee or creditor beneficiary of the performance of the contract.") The court in *Boy Scouts of America* interpreted *Graham* by stating: "[i]t is clear from the facts in

*Graham*, as well as a review of the cases cited by the *Graham* court in support of its "special relationship" exception, that the special relationship it is referring to is that of a third-party beneficiary to the contract."  790 S.W.2d at 747.

**III.    Analysis**

    **A.    The Effect of the Master Lease**

Sandvik and the plaintiffs focus their arguments on whether the plaintiffs were a party to the Lease.  Under Texas law, in order for the plaintiffs to have standing to sue Sandvik, they must be either a party to the Lease or a third-party beneficiary of that Lease.  Neither the plaintiffs nor Sandvik assert that the plaintiffs are third-party beneficiaries.  There is no evidence in the record suggesting the possibility of third-party beneficiary status.  The issue is whether the plaintiffs are a party to the Lease, which requires a determination of whether the Lease was assignment or a sublease.

The Lease originated on March 6, 2006 between Today Portofino as the Lessor and Sandvik as the Lessee.  (Docket Entry No. 5, Ex. A).  On August 5, 2008, Today Portofino assigned all its rights and interests in the leased premises to PTCA.  (Docket Entry No. 8, Ex. D).  PTCA became the Lessor; Sandvik remained the Lessee.  On the same day, PTCA entered into the Master Lease with DBSI, which designated PTCA as the Landlord and DBSI as the Tenant.  (Docket Entry No. 5, Ex. D).  The Master Lease stated: "[l]andlord hereby assigns and transfers to Tenant, to the extent transferable . . . all of the Landlord's rights, duties and obligations under the Existing Leases and the Service Contracts, including, without limitation, the right to collect rents and other charges under the Existing Leases . . . ."  (*Id.* at 5).  Sandvik maintains that the Lease was an "Existing Lease" as

defined by the Master Lease, and therefore was assigned to DBSI by PTCA.[2]  (Docket Entry No. 5 at 3).

Also on August 5, 2008, PTCA sold its rights and interests in the premises to the plaintiffs in a Special Warranty Deed.  (Docket Entry No. 8, Ex. F).  The Special Warranty Deed stated that the sale included the property "[t]ogether with all and singular the tenements, heriditaments, easements, rights and appurtenances, thereunto belonging or in any way appertaining, the reversion and reversions, remainder and remainders, rents, issues, and profits thereof; and of all estate, right and interest in and to the Property, as well in law and in equity."  (*Id.* at 1).  The Master Lease stated that the plaintiffs had title to the premises: "[a]s material inducement to Landlord in the making of this Lease, Tenant does hereby represent and warrant to Landlord that Tenant is acquainted with the nature and condition, in all material aspects, of the Premises, including the title of Landlord thereto . . . ."  (Docket Entry No. 5, Ex. D at 5).  The Master Lease defined "Landlord" as PTCA and "those persons and entities who become owners of the Premises from time to time during the Term of this Lease."  (*Id.* at 4).

It appears that under the Special Warranty Deed and the Master Lease, as of August 5, 2008, the plaintiffs owned the premises and were the "Landlord" under the Master Lease, with DBSI as Tenant.  Sandvik argues that the Master Lease assigned the Lease to DBSI "and the Lease became a sublease under the Master Lease."  (Docket Entry No. 5 at 3).  It appears from the current record, however, that the Lease was not assigned to DBSI.  Under the Master Lease, the plaintiffs retained

---

[2]    The Master Lease defines "Existing Lease" as "leases, subleases, tenancies, licenses, occupations and rights of others, other than those established hereby, which relate to the use of the Premises of any portion thereof . . ."  (Docket Entry No. 5, Ex. D at 5).

the right to reenter and repossess the premises if DBSI defaulted.  (Docket Entry No. 8 at 5).[3]  Under
Texas law, "[i]f the assignor-lessee retains a right to reenter and repossess the property on default
of rental payments, the assignor-lessee retains a contingent reversionary interest and the instrument
will construed as a sublease." *718 Assocs., Ltd.*, 1 S.W.3d 355 at 360.  "An instrument may purport
to be an 'assignment,' but will be construed as a sublease if the assignor retains any reversionary
interest."  *Id*.  Because the plaintiffs retained a reversionary interest in the property, it appears that
the Lease was not assigned to DBSI in the Master Lease, and the Lease with Sandvik did not become

---

[3]     The Master Lease states in relevant part:

> 18.2   In the event of any Default by Tenant as hereinabove provided in
> this Section 18, Landlord, (or if Landlord is constituted of more than one
> person or entity, any such properly authorized person or entity) at any
> time thereafter may, at Landlord's option, give Tenant five days written
> notice of Landlord's intention (among other remedies available to
> Landlord) to (a) terminate Tenant's possession under this Lease or (b)
> terminate this Lease, and thereupon, at the expiration of the said five day
> period the Tenant's right to possession under this Lease and this Lease
> itself shall terminate as appropriate and the Term of this Lease shall
> expire as fully and completely as if that date were the date herein
> specifically fixed for the expiration of the Term of this Lease and Tenant
> shall then quit and surrender the Premises to Landlord, but Tenant shall
> remain liable as hereinafter provided.

> 18.2.1  Upon the occurrence of any Default by Tenant under this Lease,
> Landlord shall have the option to pursue any one or more of the
> following remedies without any notice (except as otherwise specifically
> set forth herein) or demand for possession whatsoever: (a) with five days
> prior written notice, terminate this Lease, in which event Tenant shall
> immediately surrender the Premises to Landlord; (b) with five days prior
> written notice, terminate Tenant's right to occupy and possess the
> Premises and re-enter and take possession of the Premises (without
> terminating the Lease); (c) enter the Premises and do whatever Tenant is
> obliged to do under the terms of this Lease and Tenant agrees to
> reimburse Landlord on demand for any expenses which Landlord may
> incur in effecting compliance with Tenant's obligations under this Lease,
> and Tenant further agrees that Landlord shall not be liable for any
> damages resulting to Tenant from such action; and (d) exercise all other
> remedies available to Landlord at law or in equity, including, without
> limitation, injunctive relief of all varieties.

a sublease.  Sandvik remained a party to the preexisting Lease with the plaintiffs and was not a party

to the Master Lease.  Because the current record indicates that the Lease with Sandvik did not

become a sublease under the Master Lease, it appears that privity of contract between the plaintiffs

and Sandvik was not destroyed.  Instead, the present record shows that the Lease remained as a

direct contract between Sandvik and the plaintiffs, independent of the Master Lease.

### B.       Effect of the Bankruptcy Court Order

Sandvik argues that the February 10, 2009 Bankruptcy Court Order giving DBSI the

authority to reject the Master Lease and the Lease, (Docket Entry No. 5, Ex. F), extinguished the

Lease and the Master Lease.  (Docket Entry No. 5 at 4).  Because, on the present record, the Lease

preexisted the Master Lease, and the plaintiffs did not assign the Lease to DBSI, it appears that the

Lease existed independently of the Master Lease and was not extinguished by the Bankruptcy Court

Order.  Sandvik was not a party to the Master Lease.  The record shows that the plaintiffs'

contractual relationship with Sandvik under the Lease continued despite the Order.

The Master Lease itself contains language "to prevent the extinguishment of the Lease."

(Docket Entry No. 12 at 4).  The definition of "default" in the Master Lease includes filing a

voluntary petition in bankruptcy.  (Docket Entry No. 5, Ex. G at 20).  Section 18.2 of the Master

Lease gives the plaintiffs the option of terminating the Master Lease on a default by DBSI.  Section

17.8 states: "[t]enant agrees that upon termination of the [Master Lease,] all underlying leases of the

Property shall be deemed assigned to the Landlord without any act or deed of Landlord or Tenant."

(*Id.* at 19, 21).  Even if the Lease was assigned to DBSI, eliminating privity of contract between the

plaintiffs and Sandvik, the bankruptcy was a default under the Master Lease.  Section 17.5 of the

Master Lease also gives the plaintiffs the right to collect rent from Sandvik under the Lease in the

event of a default by DBSI. "The effective date of Landlord's right to collect rents shall be the date of the happening of a Default under Section 18." (*Id.* at 19). Under this analysis, the plaintiffs' claim for rent from Sandvik would accrue on November 10, 2008, the date DBSI filed for bankruptcy. (Docket Entry No. 12 at 2).

On the limited record currently before this court, the plaintiffs are successors-in-interest to the Lease with Sandvik through conveyances from Today Portofino and PTCA. The plaintiffs and Sandvik are parties to the Lease. Because privity of contract exists on the present record, the plaintiffs have standing to sue Sandvik for breach of the Lease under Texas law. Subject-matter jurisdiction for their claims is present.

## IV.    Conclusion

Sandvik's motion to dismiss for lack of subject-matter jurisdiction is denied.

SIGNED on November 25, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

15